# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOCUST VALLEY ENTERPRISES, LLC, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UPPER SAUCON TOWNSHIP, et al., | : | No. 07-3059 |
| Defendants. | : | |
| _____ | : | |
| | : | |
| LOCUST VALLEY GOLF CLUB, INC., et al., | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| UPPER SAUCON TOWNSHIP, et al., | : | No. 07-4305 |
| Defendants. | : | |

## MEMORANDUM AND ORDER

**Schiller, J.**                                                    **July 11, 2008**

Plaintiffs Locust Valley Enterprises, LLC ("LVE"), Locust Valley Golf Club, Inc. ("LVGC"), James Kuehner, Richard Schwab and Kathleen Schwab bring these consolidated actions against Defendants Upper Saucon Township ("Township"), the Upper Saucon Township Board of Supervisors (the "Board"), Supervisors Miro Gutzmirtl, Joseph Horvath and Steven Wagner in their official and individual capacities, Supervisor James White in his official capacity and Township Manager Thomas Biel in his official and individual capacity. Plaintiffs, the sellers and buyer of certain property in Upper Saucon Township, assert claims pursuant to 42 U.S.C. § 1983 for deprivation of their Fourteenth Amendment rights to substantive due process and equal protection, and state law claims for tortious interference with contractual relations and civil conspiracy. Plaintiffs' claims arise from Defendants' denial of public sewer access to Plaintiffs' property, which

impeded Plaintiffs' intended development of the property.   Currently before the Court are all Defendants' motions for summary judgment.   For the following reasons, Defendants' motions are granted.

I.      **BACKGROUND**

   A.      **The Parties**

   Plaintiff LVE is a limited liability company that was formed on behalf of McGrath Construction, Inc. d/b/a McGrath Homes ("McGrath") to develop LVGC's property.  (Defs.' Mot. for Summ. J. [hereinafter "Defs.' Mot."] Ex. R (Callahan Dep.) at 87.)  John J. McGrath, Jr. and Patrick Flanagan of McGrath entered into several agreements with Plaintiff LVGC for purchase of LVGC's property, which is currently a golf course.[1]  (Defs.' Mot. Ex. N & Ex. O & Ex. P.)  LVE is McGrath's nominee to the purchase and sale agreements.  (Pls.' Jt. Resp. to Defs.' Mot. for Summ. J. [hereinafter "Pls.' Resp."] Ex. 1 (Assignment of Agreement).)  Part of the property is located in Upper Saucon Township, and the other part is located in the Township of Springfield. (Defs.' Statement of Undisputed Facts [hereinafter "Defs.' SOF"] ¶ 13; Pls.'Jt. Counterstatement to Defs.' Statement of Undisputed Facts [hereinafter "Pls.' SOF"] ¶ 13.)  The part of the property in Upper Saucon Township is located in an R-2 zoning district, meaning a suburban residential district.  (Defs.' SOF ¶ 41; Pls.' SOF ¶ 41; Defs.' Ex. BB (Zoning Map) & Ex. CC (Upper Saucon Township

---

[1] The first agreement, dated August 13, 2004, contemplated that McGrath would construct an age-qualified community on the premises.  (Defs.' Mot. Ex. N (2004 Purchase and Sale Agreement).)  LVGC and McGrath entered into two subsequent agreements for the purchase and sale of the same property — one on March 3, 2006 and one on December 14, 2006 — which contemplated that McGrath would develop the property as single family homes.  (Defs.' Mot. Ex. O (Mar. 2006 Purchase and Sale Agreement) & Ex. P (Dec. 2006 Purchase and Sale Agreement).)

Zoning Ordiance).)  Plaintiffs James Kuehner and Kathleen Schwab own LVGC; Plaintiff Richard

Schwab, Kathleen Schwab's husband, was previously an owner of LVGC but is not a shareholder

at this time.  (Defs.' SOF ¶¶ 3-5; Pls.' SOF ¶¶ 3-5; Defs.' Ex. F (R. Schwab Dep.) at 26-28.)

Defendants are the Township, several individuals who served as members of the Township

Board of Supervisors at times relevant to this action, and the Township Manager.

### B.    The Township's Act 537 Plan

Pursuant to the Pennsylvania Sewage Facilities Act, the Township maintains a public

sanitary sewer system plan, known as an Act 537 Plan.  (Defs.' SOF ¶ 22; Pls.' SOF ¶ 22; Defs.'

Mot. Ex. S (2001 Act 537 Plan).)  The Township's Act 537 Plan provides public sewer service to

the golf course property via Existing Sewer Service Area 11 ("ESA 11"), which is a part of the South

Branch Interceptor of the Township's sanitary sewer system.  (Defs.' SOF ¶¶ 24, 27; Pls.' SOF ¶ 24;

Defs.' Mot. Ex. X (Special Study) at 1.)  ESA 11 is serviced in part by the Coopersburg Connection

Interceptor.  (Defs.' Mot. Ex. S at 39 & Ex. W (Inter-Municipal Agreement).)  During periods of

significant rainfall, wastewater flows exceed the capacity of this interceptor.  (Defs.' Mot. Ex. S at

39.)  As a result, the Township imposed a moratorium on new sewer connections upstream of

Coopersburg Borough; this moratorium had been in effect since in the mid-1990s.  (Defs.' Mot. Ex.

T (Apr. 15, 2008 Schreiter Dep.) at 34-35.)  The golf course property was subject to that moratorium.

(Defs.' Mot. Ex. X at 8.)

The 2001 version of the Township's Act 537 Plan disclosed the existence of the moratorium

and the inability of the current system to "service the total projected growth" in the area upstream

of Coopersburg.  (Defs.' Mot. Ex. S at 13, 39.)  However, The Act 537 Plan noted the availability

of a "pump around" option, which would require "construct[ion] [of] a pumping station and

transport[ation] [of] the extra wastewater to Township sanitary sewers located in Gun Club Road." (*Id.*; *see also* Pls.' Resp. Ex. 4 (Feb. 27, 2002 Schreiter Letter) at 10-15.)  In other words, a developer could bypass the prohibition by constructing a new pumping station that would carry waste around the overloaded area using existing sewers.

### C.     McGrath's Initial Proposal

In June 2004, prior to entering into its first purchase and sale agreement with LVGC, representatives of McGrath met with Township representatives to determine whether public sewer access would be available to support development of the property as an age qualified community ("AQC").  (Defs.' Mot. Ex. R at 72-73.)  McGrath was aware of the moratorium on connections upstream of Coopersburg and wanted to investigate viable alternatives.  (*Id.* at 73.)  Karl Schreiter, the Township's sewer engineer, suggested the pump around option, but explained that he would have to do a flow analysis to determine whether the areas of the system that McGrath sought to utilize in connection with the pump around had the capacity to service McGrath's proposed development. (Defs.' SOF ¶ 36; Pls.' SOF ¶ 36.)

That August, Paul Callahan of McGrath submitted to the Township a rough sketch plan of the proposed development of the property as an AQC housing development with 300 residential units.  (Defs.' Mot. Ex. Z (Aug. 20, 2004 Letter).)  Callahan also requested that Schreiter conduct a flow analysis as Schreiter proposed.  (*Id.*)  In a letter to Charles Ruppert, the Township's Supervisor of Planning and Development, Schreiter responded that the existing sewers in Gun Club Road "may not have sufficient capacity to transport additional flows generated by this alternative," but that "[w]ithout further detailed analysis, it has been assumed that these sewers will have sufficient capacity."  (Defs.' Mot. Ex. Y (Aug. 31, 2004 Letter from Schreiter) at 2.)  In subsequent

letters, Schreiter explained that successful implementation of the pump-around option required: (1) that McGrath construct a pumping station to divert the sewage around the Coopersburg connection; (2) that McGrath augment certain existing sewage lines in Gun Club Road; (3) amending the Township's Act 537 Plan to account for additional growth, which would require a Special Study to confirm capacity; and (4) an intermunicipal agreement with Springfield Township since the property extended to that municipality. (Defs.' Mot. Ex. AA (Oct. 26, 2004 Letter from Schrieter to Ruppert); Pls.' Resp. Ex. 5 (Apr. 18, 2005 Letter from Schreiter to Beil).) Nevertheless, Schreiter represented that "the Township has sufficient capacity to provide service to the subdivision." (Pls.' Resp. Ex. 5.)

        In addition to securing sewer access, McGrath required an amendment to the Township's zoning ordinance in order to develop the property as an AQC. Accordingly, McGrath proposed an amendment to the Township's zoning ordinance to provide for an "Age Qualified Community Overlay District" in general, and to specifically approve golf course for AQC development. (Defs.' SOF ¶ 45; Pls.' SOF ¶¶ 45-48; Defs.' Mot. Ex. R at 133-36.) The ordinance would have also designated two unrelated properties as AQC-qualfied. On March 22, 2005, the Board voted not to adopt the proposed Ordinance. (Defs.' Mot. Ex. DD (Mar. 22, 2005 Board Meeting Minutes) at 634.) Defendants Gutzmirtl and Horvath, both private citizens at the time, spoke out in favor of a general AQC Ordinance but in opposition to the simultaneous designation of the listed properties as AQC qualified. (Pls.' Resp. Ex. 11 (Meeting Tr.) at 41-51.) Of the named Defendants, only White and Wagner were Supervisors during this time — White voted to adopt the ordinance while Wagner voted to the contrary. (Defs.' Mot. Ex. DD at 634.)

        Although the Board did not adopt McGrath's ordinance as written, on June 14, 2005, the

Board adopted a revised ordinance that would allow for an AQC Overlay District without specifying which properties could be developed as such. (Defs.' Ex. EE (Ordinance No. 79-QQ.).)  Pursuant to that ordinance, a developer would have to petition the Board individually for an amendment to the ordinance in order to develop his or her specific land as an AQC.  The Board retained full discretion to grant or deny a developer's petition, which would be determined on a "parcel-by-parcel" basis. (*Id.* at 2.)  Accordingly, McGrath petitioned the Board for an amendment to designate the golf course property for development as an AQC, which the Board considered at a September 27, 2005 meeting.  (Pls.' Ex. 13 (Sept. 27, 2005 Meeting Minutes) at MCG0306.)  Several citizens voiced concerns about development of the golf course, including concerns about the density of the development and the fact that the Township did not need more than one AQC.[2] (*Id.* at MCG0307.)  Ultimately, the Board rejected McGrath's proposal for AQC designation.  (*Id.*)  Again, Wagner and White were the only Defendants who were Board members at that time.  Wagner voted against McGrath's petition based on his concerns about sewer availability, while White, who was in the minority, voted to the contrary.  (*Id.*)

### D.     McGrath second proposal

McGrath had a back-up plan to develop single family homes on the property.  On September 13, 2005, shortly before the rejection of its AQC petition, McGrath submitted an application for preliminary plan approval for "Locust Valley Singles" ("LVS") — a 125 lot subdivision for development of the property as single family homes.  (Pls.' Resp. Ex. 12 (Sept. 13, 2005 Letter submitted plans for LVS).)   As part of the LVS plan, McGrath proposed an amendment to the Township's Act 537 Plan to permit connection to public sewer by virtue of the pump around option.

---

[2] The meeting minutes do not indicate that Gutzmirtl and Horvath were in attendance.

(*Id.* at MCG0620-621.)

As with the AQC proposal, Schreiter analyzed the viability of a pump around option to service the LVS development, and reached the same conclusions, i.e., that the pump around option was feasible but that it would require amendment of the Township's Act 537 Plan and enlargement of the existing sewers in Gun Club Road.  (Pls.' Resp. Ex. 6 (Apr. 20, 2005 Letter from Schreiter to Ruppert) & Ex. 8 (Oct. 4, 2005 Letter from Schreiter to Ruppert) & Ex. 9 (Oct. 5, 2005 Letter from Schreiter to Rupert).)  Schreiter recommended that the requisite Special Study be conducted to evaluate whether sufficient reserve capacity existed in the sewer system to accommodate the LVS development, and ultimately recommended that the Township and/or the Upper Saucon Township Municipal Authority ("USTMA") authorize McGrath's proposed amendment to the Act 537 Plan.[3] (Pls.' Resp. Ex. 10 (USTMA Oct. 18, 2005 Meeting Minutes) at UST01294; Defs.' SOF ¶ 51; Pls.' SOF ¶ 51; Defs.' Mot. Ex. GG (Oct. 5, 2005 Letter from Schreiter).)  McGrath requested that the Township authorize Schreiter to perform the Special Study.  (Defs.' SOF ¶ 52; Pls.' SOF ¶ 52; Defs.' Mot. Ex. HH (Oct. 13, 2005 Letter from Flanagan).)  The Board unanimously authorized the Special Study at a November 22, 2005 meeting, and McGrath withdrew its submission pending completion of the study.  (Defs.' SOF ¶ 53; Pls.' SOF ¶ 53; Defs.' Mot. Ex. II (Nov. 22, 2005 Board Meeting Minutes) at 734-37.)  The study was expected to last for three months, to be followed by a thirty day public comment period.  (Defs.' Ex. II at 735, 737.)  Around this time, Defendants Gutzmirtl and Horvath were elected to the Board, and would begin their term in January 2006.  (Defs.' SOF ¶¶ 7-8; Pls.' SOF ¶¶ 7-8.)

---

[3] The USTMA owns the municipal sanitary sewer system, which the Township operates pursuant to a lease with the USTMA.  (Defs.' Mot. Ex. XX (DEP Order) at 1 ¶ D.)

7

### E.     The Special Study

The Special Study required the insertion of flow meters in two locations in the South Branch Interceptor of the Township's sewer system so as to monitor and collect flow data for analysis. (Defs.' Mot. Ex. T at 163.)  The meters were not installed until February 28, 2006, and the study began on that date.  (*Id.* at 163-65; Defs.' Errata Sheet ¶ 58; Pls.' SOF ¶¶ 54-60.)  During the period from at least April 2006 through May 2006, the Township experienced drought conditions.  (Defs.' Mot. Ex. T at 166-69 & Ex. KK (Apr. 19, 2006 Minutes from General Business & Developer Meeting) at 4.)  Schreiter was concerned that as a result of the drought, there would be insufficient rainfall to determine whether the pump around would function properly in normal wet weather conditions.  (Defs.' Mot. Ex. T at 166-69, 235-36.)  Accordingly, Schreiter sought to extend the Special Study until he could gather sufficient data.

In May 2006, upon request, Schreiter provided Fred Ebert, McGrath's sewer consultant, with the data Schreiter had collected as of that time.  (Pls.' Resp. Ex. 17 (Ebert Aff.) ¶ 78.)  Ebert analyzed the nearly seventy days of flow data he received from Schreiter, which included rain events; Ebert concluded that the system had sufficient capacity to support the LVS development.  (*Id.* ¶¶ 78-80.)  By this point, Schreiter was being pressured by McGrath to complete the study.  (Defs.' Mot. Ex. T at 234-36.)  Schreiter spoke to Defendant Beil about the issue, who explained that he too was being pressured by McGrath, and suggested that Schreiter prepare a timeline for completion of the study.  (*Id.*; Defs.' Mot. Ex. M (Beil Dep.) at 117-20.)  Schreiter's timeline, which he forwarded to Beil and the Board, indicated that a draft of the completed study would be available by mid-July 2006, and envisioned Township action by mid-September after a thirty day public comment period. (Defs.' Mot. Ex. LL (June 7, 2006 Schreiter Letter re Proposed Schedule); Pls.' Resp. Ex. 16 (E-mail

attaching Schreiter Letter).)

In late June 2006, the Township experienced significant rainfall, which caused a hydraulic overload in the South Branch Interceptor.  (Defs.' Mot. Ex. X at 41, 83; Pls' Resp. Ex. 18 (Ebert Expert Report) at 8-9.)   After the rain event, in accordance with his timeline, Schreiter completed the Special Study and issued his final report on July 27, 2006. (Defs.' Ex. X.) Schreiter rejected the pump around alternative based on insufficient hydraulic capacity, as illustrated by the late June rainfall, and instead recommended "that the Township implement [a] No Action Alternative." (*Id.* at 62, 82-83.)  Under the "No Action" alternative, McGrath's development would be serviced by individual on-site systems instead of by public sewer.  (*Id.* at 62.)  Schreiter recognized that service by individual on-site systems would "decrease the number of dwelling units . . . [but concluded that the solution would] not preclude development of the property in accordance with the Zoning Ordinance, SALDO [subdivision and land development ordinance] and the Comprehensive Plan." (*Id.* at 62, 82.)  From McGrath's perspective, this alternative was economically unfeasible.  The Special Study was never published for comment.

Ebert analyzed Schreiter's Special Study and concluded that "this severe rain event should not have been the basis to declare an existing hydraulic overload thereby resulting in the denial of public sewer connections to the proposed LVS" because the rainfall during that time was far in excess of average wet-weather conditions in the Township.  (Pls.' Resp. Ex. 18 at 10.)  As a result, Ebert concluded that the Special Study was not conducted "in accordance with good engineering practices and sound engineering judgment."  (*Id.* at 10, 14.)

### F.    Rejection of McGrath's LVS plan

On August 1, 2006, the Upper Saucon Township Planning Commission recommended denial

of McGrath's LVS Plan based on Schreiter's Special Study, and on the plan's failure to comply with certain SALDO requirements.  (Defs.' Mot. Ex. MM (Aug. 1, 2006 Commission Meeting Minutes) at UST00599-600.)  Accordingly, McGrath's attorney sent two letters to Beil offering the Board an extension until October 31, 2006 to review the LVS Plan, and explaining that McGrath intended to comply with the SALDO requirements that, in part, caused the Planning Commission to recommend denial.  (Defs.' Mot. Ex. PP (Aug. 22, 2006 Letter from Hecker to Beil); Pls.' Resp. Ex. 21 (Aug. 16, 2006 Letter from Hecker to Beil).)  Nevertheless, the plan was listed on the Board's agenda for an August 22, 2006 meeting.

At the August 22 meeting, the Board voted to deny McGrath's amendment to the Act 537 Plan based on the results of Schreiter's Special Study, with Wagner, Gutzmirtl, Horvath, and White voting in favor of denial.  (Defs.' Ex. OO (Aug. 22, 2006 Board Meeting Minutes) at MCG0488.)  Consequently, McGrath's counsel, who was present at the meeting, requested an extension of time to submit a revised plan.  (*Id.*)  He also requested that the Board conditionally approve the LVS plan subject to McGrath's compliance with certain review comments and relevant SALDO provisions, and upon resolution of the sewer access issue. (*Id.* at MCG0489.)  The Board denied McGrath an extension, and refused to authorize conditional approval, instead adopting Resolution No. 2006-39 denying McGrath's LVS plan.  (*Id.*; Defs.' Mot. Ex. RR (Resolution 2006-39).)   According to the resolution, the reasons for denial included: (1) failure to address comments of Schreiter and the USTMA engineer, regarding, among other things, the plan's failure to comply with certain SALDO provisions; and (2) failure to comply with the Township's Act 537 Plan, because it proposed use of "sewer lines which are hydraulically overloaded as per the special study." (Defs.' Mot. Ex. RR.)  Wagner, Gutzmirtl and Horvath voted to deny the extension and the LVS plan, while White and his

10

wife, who was also a Supervisor at the time, voted to the contrary. (Defs.' Mot. Ex. OO at MCG0489.)

### G.      Prior litigation

From there, a flurry of litigation ensued.  McGrath appealed the Board's denial of the LVS plan to the Court of Common Pleas of Lehigh County, filed a petition with the Court of Common Pleas objecting to the Township's failure to conduct a hearing on Schrieter's Special Study, and filed a private request with the DEP for an amendment to the Township's Act 537 Plan.  (Defs.' Mot. Ex. SS (McGrath's Appeal) & UU (McGrath's Petition for Review); Defs.' SOF ¶ 90; Pls.' SOF ¶ 90.)

The Court of Common Pleas affirmed the Board's denial of the LVS plan, and McGrath subsequently appealed that decision to the Commonwealth Court of Pennsylvania.  (Defs.' Mot. Ex. TT (June 20, 2007 Order & CCC (McGrath's Appeal).)  The Court of Common Pleas also dismissed McGrath's petition, concluding that McGrath had "no right to a hearing in response to a municipality's refusal to revise its official sewage disposal plan." (Defs.' Ex. VV (May 1, 2007 Order) at 7.)

Shortly after Defendants filed for summary judgment in the instant action, the Commonwealth Court ruled on McGrath's appeal from the Court of Common Pleas, "agree[ing] with the trial court that it was within the discretion of the Board to deny the [LVS] Plan."  (Defs.' Mot. Ex. DDD (Commonwealth Court Op.) at 16.)  The court concluded that:

> [T]he Board was not required to condition approval of the Plan on the amendment of the Act 537 Plan.  Therefore, even if it were ultimately determined that the Township is required to amend its Act 537 Plan, that would not result in a conclusion that the Board acted improperly.  The Board was charged with deciding the matter based on the evidence available and presented to it at the time.

(*Id.* at 21.)  The court explained that if McGrath sought to develop the property in accordance with

11

its proposed development plan, the appropriate remedy is a private request to the DEP for revision of the Township's Act 537 Plan.  (*Id.* at 16.)

As mentioned above, McGrath had already pursued a private request, which the DEP ruled on shortly before Plaintiffs filed the instant case.  On June 15, 2007, the DEP ordered the Township and USTMA to make public sewer available to the LVS development.  (Defs.' Mot. Ex. XX (DEP Order).)  The DEP recognized the capacity issues caused by the Coopersburg system, but concluded that the Township was nevertheless required to fix those conditions.  (*Id.* at 7.)   Additionally, the DEP ordered the Township to submit a collective action plan ("CAP") detailing how it would correct the hydraulic overload conditions in the South Branch Interceptor, including the system in Gun Club Road; the CAP was also to explain how the Township would service the LVS development.  (*Id.*)  The DEP found that since the Township's 537 Plan failed to comply with DEP regulations, the Township had violated the Pennsylvania Clean Streams Law.  (*Id.*)  The Township appealed this Order to the Pennsylvania Environmental Hearing Board; the appeal is still pending. (Defs.' Ex. YY (Appeal of DEP Order).)

## H.    The alleged conspiracy

The crux of Plaintiffs' constitutional claims is that their development plans and sale of the property were frustrated by the Defendants, primarily Gutzmirtl, Horvath and Wagner, because Gutzmirtl sought to buy the property for himself or with other Defendants.  In connection with this alleged scheme, Plaintiffs assert that Defendants manipulated the results of the Special Study to prevent authorization of public sewer access for the LVS development.   Plaintiffs' theory is predominately based on several email exchanges among Defendants Gutzmirtl, Horvath and Wagner.

During the time that the Board was considering McGrath's proposed ordinance to allow for

AQC development, Wagner, a Supervisor at the time, was communicating with Gutzmirtl and Horvath, private citizens at the time, about the proposal.[4] (Pls.' Resp Ex. 27 (Composite) at UST1.) Clearly, Wagner was opposed to the development — in an email, he highlighted another Supervisor's statement that "the current owners [LVGC] are well within their rights to sell the land and not have impediments placed in their way," while noting that "sometimes I [Wagner] just feel like banging my head against the wall." (*Id.*) In a November 2004 email, Gutzmirtl wrote to Wagner that he had conferred with another Supervisor at the time about "setting the stage" for a Board meeting the next night. (Pls.' Ex. 27 at UST3.) Gutzmirtl further noted that John McGrath approached him to request his support of McGrath's project, but that Gutzmirtl "couldn't support the loss of this golf course and open space." (*Id.*)

Shortly thereafter, in December 2004, Gutzmirtl approached Richard Schwab of LVGC and inquired about purchasing the property. (Defs.' Mot. Ex. E (Kuehner Dep.) at 191-93 & Ex. F (R. Schwab Dep.) at 79-80; Pls.' Resp. Ex. 35 (Bailey Dep.) at 36-37.) When Schwab responded that the property was under contract, Gutzmirtl responded along the lines of: "This golf course will never be developed while I'm around." (Defs.' Mot. Ex. F at 81.) Gutzmirtl approached Schwab again in January 2005, and the same conversation transpired. (*Id.* at 81-82.) Additionally, Gutzmirtl and Horvath spoke out publicly at Board meetings against development of the golf course. (Defs.' Mot. Ex. E at 103-05, 122; Pls.' Resp. Ex. 11 (Meeting Transcript) at 41-51.)

In early 2005, Wagner helped Gutzmirtl and Horvath campaign for Board positions by

---

[4] The three men knew each other from their prior involvement in Concerned Citizens of Upper Saucon Township, a citizens' group that sought to ensure that property in the Township was developed in accordance with the Township's ordinances. (Defs.' Mot. Ex. I at 26-27 & Ex. J at 29, 37.)

drafting a letter with information about and positions on McGrath's plans.  (Pls.' Resp. Ex. 26 at UST 931.)  The letter asserted that the sewer extension sought by McGrath was not in accordance with the Township's Act 537 Plan, and thus "the extension can be legally denied since it would result in a MAJOR variance from the ACT 537 Plan and would reduce sewage capacity . . . with the final result that UST's comprehensive plan would be significantly distorted in other areas of the township." (Pls.' Resp. Ex. 32 (Mar. 16, 2005 Letter to School Board Members).)    In November 2005, Gutzmirtl and Horvath were elected to the Board for the 2006 term. (Defs.' SOF ¶¶ 7-8; Pls.' SOF ¶¶ 7-8.)

On November 23, 2005, the day after the Board authorized the Special Study, Wagner forwarded an email he had received from Paul Callahan of McGrath to Gutzmirtl and Horvath.  (Pls.' Ex. 26 at UST987.)  Wagner wrote: "This @#%^&*! Study better turn out the way we would like. Even if the authority supports a 537 change for technical reasons I will ignore it on the basis of ill conformance to the comprehensive plan, etc." (*Id.*)  Shortly thereafter, Gutzmirtl emailed Wagner and Horvath about the ongoing fight between the Township and Coopersburg regarding the overloaded interceptor.  (Pls.' Ex. 26 at UST 991.)  Gutzmirtl expressed that he did not feel as though their perspective on "growth in moderation" was being considered, to which Wagner responded:

> One fear I have is that UST will be pressured to construct a pumping station that bypasses Coopersburg so that the UST-LV area and UST area south of Coopersburg (Hillside) may be developed.  It would be best if this idea NEVER surfaced publicly. The pumping station must not happen.  For my part, I will never state that there is a link between the moratorium and development.  The link simply does not exist and I will never discuss the possibility.

(*Id.*)

14

In a December 12, 2005, just before Gutzmirtl and Horvath were preparing to take office, Gutzmirtl sent an email to Wagner and Horvath in which he wrote:

> As for Karl Schreiter, I'm now less assured as to what he said to me about his work on Locust Valley, pumping station, etc.  He assured me, he understood where we were coming from, but his study had to be done legitamitely [sic].  He gave the impression he knew what we wanted and then he threw a curve ball at me.  Tom Beil talked to Karl after my conversation with Karl and told me that Karl was doing this the right way.  We'll have to talk about this!

(Pls.' Ex. 27 at UST17.)  Wagner responded that he "share[d] [Gutzmirtl's] apprehension about the potential, dare I say likely, conclusion of Karl Schreiter's study [i.e., that Schreiter would recommend the Gun Club Road pump around]."  (*Id.*; Defs.' Mot. Ex. J (Wagner Dep.) at 419.)  As far as Schreiter could recall, the conversation referenced in Gutzmirtl's December email was the only time he spoke to Gutzmirtl about the Special Study.  (Defs. Mot. ' Ex. T at 153-54.)  Schreiter stated at his deposition that "it was common knowledge that there were no-growth representatives [such as Gutzmirtl]," but that Schreiter's knowledge of their policies did not influence his work — he "based [his] recommendations on the scientific facts."  (*Id.* at 156, 262.)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  When the moving party does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Thereafter, the nonmoving party

demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable

finder of fact to find for the nonmoving party at trial. *Anderson*, 477 U.S. at 248.  In reviewing the

record, "a court must view the facts in the light most favorable to the nonmoving party and draw all

inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).

Furthermore, a court may not make credibility determinations or weigh the evidence in making its

determination.  *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S.133,150 (2000); *see also*

*Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).


## III.   DISCUSSION

### A.     Defendants are entitled to summary judgment on Plaintiffs' substantive due process claims

In order to succeed on a Section 1983 claim for violation of substantive due process in the

context of a land use dispute, a plaintiff must establish: (1) a property interest protected by the

Fourteenth Amendment and (2) deprivation of that interest by local officials' behavior that "shocks

the conscience."[5] *United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 401-02

(3d Cir. 2003); *ABD Monroe, Inc. v. Monroe Twp.*, Civ. A. No. 04-1412, 2008 WL 58876, at *6

(D.N.J. Jan. 2, 2008).   "[U]nless the locality's decision was 'truly irrational,' no substantive due

---

[5]  Plaintiffs LVE and LVGC, as legal and equitable owners of property subject to local land use regulation, have articulated a property interest within the meaning of the Fourteenth Amendment. *See DeBlasio v. Zoning Bd. of Adjustment for Twp. of West Amwell*, 53 F.3d 591, 600-01 (3d Cir. 1995), *overruled on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003); *Maple Properties, Inc. v. Twp. of Upper Providence*, Civ. A. No. 00-4838, 2004 WL 2579740, at *4 (E.D. Pa. Nov. 12, 2004). Defendants assert that James Kuehner, Richard Schwab and Kathleen Schwab lack standing because they have no interest in the property.  Since the absence of conscience shocking behavior is dispositive of all Plaintiffs' claims, this Court will not address Defendants' standing arguments.

process violation occurs." *Corneal v. Jackson Twp.*, 313 F. Supp. 2d 457, 466 (M.D. Pa. 2003) (*quoting Bituminous Materials, Inc. v. Rice County*, 126 F.3d 1068, 1070 (8th Cir. 1997)), *aff'd*, 94 Fed. Appx. 76 (3d Cir. 2004). This heightened standard encompasses "only the most egregious official conduct," and "is designed to avoid converting federal courts into super zoning tribunals." *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 285 (3d Cir. 2004) (internal quotations omitted). "[T]o sustain such a claim, plaintiff must prove that the government action in question is something more than . . . arbitrary, capricious, or in violation of state law." *Corneal*, 313 F. Supp. 2d at 466 (internal quotations omitted, alterations in original). "[R]ejections of development projects . . . do not ordinarily implicate substantive due process," *PFZ Properties, Inc. v. Rodriguez*, 928 F.2d 28, 31 (1st Cir. 1991), and allegations that government officials acted with improper motives are likewise insufficient to make out a substantive due process claim. *United Artists*, 316 F.3d at 402; *see also Eichenlaub*, 385 F.3d at 286.

As case law makes clear, it is difficult to make out a substantive due process violation in the land use context. In *Eichenlaub*, the plaintiffs "assert[ed] that zoning officials applied subdivision requirements to their property that were not applied to other parcels; that they pursued unannounced and unnecessary inspection and enforcement actions; that they delayed certain permits and approvals; that they improperly increased tax assessments; and that they maligned and muzzled the [plaintiffs]." 385 F.3d at 286. The Third Circuit explained that "these complaints are examples of the kind of disagreement that is frequent in planning disputes," and thus, did not shock the conscience. *Id.* In contrast, the *Eichenlaub* court explained that a plaintiff might make out a substantive due process violation in the land use context where there is evidence of "corruption or self-dealing," where "local officials [seek] to hamper development in order to interfere with otherwise constitutionally protected

17

activity at the project site, or because of some bias against an ethnic group," or where the facts establish a "virtual taking."  *Id.*

Two cases are particularly instructive here.  In *Corneal v. Jackson Township*, the plaintiffs brought a substantive due process claim, alleging that the "[d]efendants [the Township, the Township's Supervisors, the Township Secretary, the Township Sewage Enforcement Officer, and the Township's building permit officer] acted in concert to frustrate the [plaintiffs'] effort to subdivide and develop their land" by "needlessly complicat[ing] and delay[ing] the [plaintiffs'] applications for permits and subdivision, thereby causing the Buyers [of the property] to cancel their sales contract with the [plaintiffs]."  313 F. Supp. 2d 457, 464 (M.D. Pa. 2003), *aff'd*, 94 Fed. Appx. 76 (3d Cir. 2004).  The plaintiffs asserted that the defendants passed a temporary moratorium on subdivisions just prior to the plaintiffs' submission of their subdivision plan even though the Township's Sewage Enforcement Officer had signed off on the plaintiffs' proposed sewer modules, refused to issue the plaintiffs a building permit when other individuals were given permits, and referred to the one of the plaintiffs as a "trouble making yuppie from over the mountain."  *Id.* at 462. Furthermore, the plaintiffs asserted that one of the defendant-Supervisors sought to frustrate the sale of the property specifically so that he or his nephew could purchase plaintiffs' land.  The court concluded that "[a]t best . . . the totality of the facts, when viewed in a light most favorable to the [plaintiffs] establishes that the Board may have acted with mixed motives; one related to a legitimate land regulation purpose (preserving land development status quo during the final approval process of the subdivision ordinance), the other related to illegitimate personal animus."  *Id*. at 468 (footnote omitted).  Since this did not rise to the level of a substantive due process violation, the court granted summary judgment.

In *Clark v. Bosher*, the First Circuit affirmed dismissal of the plaintiffs' substantive due process claim where the plaintiffs were denied access to public sewer and had their development plans rejected. 514 F.3d 107 (1st Cir. 2008). The *Clark* court found the plaintiffs' case "virtually indistinguishable" from other "run-of-the-mill" cases in which a developer claims unfair treatment. *Id.* at 113.

Here, Plaintiffs argue that Defendants deprived them of substantive due process by declining to rezone the property to allow for development of an AQC, by allegedly manipulating the Special Study, by failing to publicize the Special Study for comment, by denying McGrath's proposed amendment to the Township's Act 537 Plan, and by denying McGrath's LVS Plan. Plaintiffs argue that Defendants acted "without any rational land use planning goal," and "wrongfully blocked the sale and development of the Property because the Sellers would not instead sell the Property to some or all of the Defendants." (Pls.' Resp. at 1, 5.) Since the Defendants' conduct here is similar to the defendants in *Clark*, which was not "conscience-shocking," and at most illustrates that Defendants acted with mixed motives as in *Corneal*, Plaintiffs cannot establish a substantive due process violation.

As a preliminary matter, the Board acted well within its discretion in denying McGrath's proposed amendment to designate the golf course as AQC-qualified. It is completely within the Board's discretion whether to amend its zoning ordinance to allow a particular property to be zoned as an AQC. The Board was concerned that, with respect to LVGC's parcel, the public sewer system could not support the large number of residences that McGrath sought to develop. It was certainly rational for the Township to oppose development on this basis, out of concern that McGrath's development would cause overloads in the Township's sewer system.

19

Likewise, the Board's denial of McGrath's amendment to the Act 537 Plan and denial of the LVS Plan were based on the concern that the Township's sewer system lacked capacity to support the development. This conclusion was based on Schreiter's Special Study, which indicated that the pump around solution — McGrath's proposed means of servicing its development — would not function as intended. It was clearly rational for the Board to prevent a development that would pose a risk to the Township's sewer system by causing overloads, and the Board was justified in relying on the Special Study.

In attempt to circumvent this conclusion, Plaintiffs assert that Defendants Wagner, Horvath, and Gutzmirtl manipulated the outcome of the Special Study so as to provide a pretextual basis for denial of the plan. Plaintiffs assert that these three men were the main conspirators who sought to block development of the property, and that they manipulated Schreiter into fixing the results of the Special Study to indicate that the sewer system could not support the LVS development. Although Plaintiffs have adduced evidence that Wagner, Horvath and Gutzmirtl were vehemently opposed to the development of the golf course, Plaintiffs have not produced any evidence establishing the requisite link between this opposition and the results of the Special Study.

Contrary to Plaintiffs' argument, such a result is not compelled simply because Plaintiffs' expert disagrees with Schreiter's conclusions. The issue here is not whether Schreiter's Special Study was conducted in accordance with best engineering practices, but whether the Defendants somehow violated Plaintiffs' substantive due process rights in connection with their decisions affecting Plaintiffs' property. Plaintiffs are also incorrect in their assertion that Schreiter's dependence on the renewal of his contract with the Township supports an inference that the Special Study was rigged. (Pls.' Resp. 18-21; Defs.' Mot. Ex. H at 285-86 & Ex. I (Horvath Dep.) at 76 &

Ex.T at 147.)   There is absolutely no evidence that Schreiter's employment was ever threatened in any way by any of the named Defendants in connection with his role in the Special Study, or that Schreiter's conclusions were based on anything communicated to him by any of the named Defendants.  This is *confirmed* by Gutzmirtl's email, which notes that Beil relayed to Gutzmirtl that Schreiter wanted to conduct the study "the right way."  Overall, there is simply insufficient evidence to support an inference that the Special Study was rigged in violation of Plaintiffs' constitutional rights.[6]   Plaintiffs' theory is comprised solely of speculation, which is insufficient to overcome summary judgment.[7]

   In attempt to fit the facts of this case into the framework established by *Eichenlaub*, Plaintiffs allege that Defendants were motivated by "self-dealing" and "corruption" because

---

   [6] Ebert's statement in his affidavit that he spoke with Schreiter in May 2006 and that "[i]n the context of [their] telephonic conversation, it was clear to [Ebert] from [Schreiter's] statements that [Schreiter] was influenced by the Defendants to continue the Special Study until a negative result occurred" does not change this result. (Pls.' Resp. Ex. 17 at ¶ 83.)  This is nothing more than a conclusory statement by Plaintiffs' expert and is notably devoid of any supporting articulable facts or actual statements by Schreiter that would permit this Court to draw the same conclusion that Ebert did.  Likewise, the Court rejects Plaintiffs' argument that the Special Study must have been influenced because Schreiter "was seeking and/or acceding to guidance from people with no sewer engineering experience [i.e., Beil and the USTMA Solicitor]." (Pls.' Resp. at 24.)  The fact that Schreiter was seeking advice on how to deal with McGrath and Ebert in light of the contentiousness of the situation, does not warrant an inference that he was taking engineering advice from Township officials.

   [7] Furthermore, Plaintiffs have failed to adduce any evidence that Defendants Beil and White were influenced in any way by Gutzmirtl, Horvath and Wagner's desire to impede McGrath's devleopment of the golf course.  Indeed, Defendant White voted *in favor* of McGrath's proposals and requests every step of the way with the exception of his vote to deny the amendment to the Act 537 Plan based on the Special Study.  Consequently, it would be inappropriate to impute such improper motives to the other Defendants based on nothing more than plaintiffs sheer speculation.  *See Corneal*, 313 F. Supp. 2d at 468 n. 9 ("[E]ven if [one defendant Board member] were ill motivated, it would be improper to impute that motive to any of the other Defendants without evidence that they possessed a similar motive and willingly participated in [defendant Board member's] scheme.")

Gutzmirtl sought to buy the property at one point.  This evidence is insufficient to overcome summary judgment as in *Corneal*, where summary judgment was appropriate despite evidence that one of the defendant's nephews sought to purchase the property in question.[8]  *Corneal*, 313 F. Supp. 2d at 464-65.  Plaintiffs also argue that they have made out a substantive due process violation under *Eichenlaub* because LVGC has been forced to operate the golf club at a loss during McGrath's prolonged struggle to develop the property, thereby resulting in a "virtual taking."  Large development projects are often met with delay.  That a party to a purchase and sale agreement suffers financial loss pending the approval of municipal authorities comes with the territory, and can by no means be considered a "virtual taking."  *Compare Conroe Creosoting Co. v. Montgomery County*, 249 F.3d 337 (5th Cir. 2001).

Finally, that the DEP required the Township to provide public sewer access to support the LVS development does not upset the conclusion that no substantive due process violation exists, even if the Pennsylvania Environmental Hearing Board ultimately affirms the DEP's conclusions. Indeed, even "[a] bad-faith violation of state law remains only a violation of state law," and does not itself make out a constitutional violation.  *See, e.g.*, *Chesterfield Dev. Co. v. City of Chesterfield*, 963 F.2d 1102, 1105 (8th Cir. 1992).  For the same reason, the fact that the Special Study was not published for comment and was adopted without a hearing, assuming that such a hearing was even required, does not amount to a substantive due process violation.  Furthermore, it bears noting that every other court that considered Defendants' actions in connection with McGrath's projects

---

[8] This case is clearly distinguishable from *Collier v. Town of Harvard*, in which the plaintiffs' substantive due process claim survived summary judgment because evidence existed that the defendants attempted to extort an easement from the plaintiffs in exchange for approval of plaintiffs requests for certain permits and variances.  Civ. A. No. 95-11652, 1997 U.S. Dist. LEXIS 23582 at **20-22 (D. Mass. Mar. 28, 1997).

concluded that the Board *complied* with state law in its treatment of McGrath.

In sum, Plaintiffs have failed to produce sufficient evidence to remove this case from the realm of garden variety, run of the mill land use disputes.  Taking all inferences in favor of the Plaintiffs, Plaintiffs have shown, at most, that certain Board members were opposed to McGrath's development of the property.  This is insufficient to overcome summary judgment.  While Defendants Wagner, Horvath and Gutzmirtl may have targeted their anti-development beliefs at McGrath, their conduct sounds in local politics, not self-dealing, and simply does not rise to the level of a constitutional infraction.  Since Defendants' conduct does not shock the conscience as a matter of law, summary judgment is appropriate on Plaintiffs' substantive due process claims.

**B.     Defendants are entitled to summary judgment on Plaintiffs' equal protection claims**

In order to succeed on a "class of one" equal protection claim, a plaintiff must establish that he or she has "'been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in the treatment.'" *Highway Materials*, 2004 WL 2220974, at *21 (*quoting Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curium)).  "Two persons or entities are similarly situated if a prudent person, looking objectively at the incidents [complained of], would think them roughly equivalent and the protagonists similarly situated . . . in all relevant respects." *Clark*, 514 F.3d at 114 (internal quotations omitted and alterations in original).  "A 'class of one' can attack intentionally different treatment if it is irrational and wholly arbitrary." *Eichenlaub*, 385 F.3d at 286 (internal quotations omitted).  "The 'irrational and wholly arbitrary' standard is doubtless difficult for a plaintiff to meet in a zoning dispute." *Id.* at 287.  Indeed "[i]t may be very unlikely that a claim that fails the substantive due process test will survive under an

equal protection approach."  *Id.*

Here, Plaintiffs point to two properties that were allegedly similarly situated to LVS but from which LVS was treated differently — development projects known as "Blue Ridge West Estates" and "Curly Horse."  (Pls.' Resp. at 39-42.)   The "Curly Horse" project was a 72 lot single family home cluster development that provides for fifty percent open space, which was built on property serviced by the Township's North Branch Interceptor.  (Defs.' Ex. NN (Beil Decl.) ¶¶ Ai, Aii; Pls.' Ex. 24 (Ruppert Dep.) at 32.).)  The Curly Horse development was not subject to the Coopersburg prohibition and did not require an amendment to the Township's Act 537 Plan for approval.  (*Id.* ¶¶ Aii, Avi.)  Blue Ridge West Estates was developed in two phases — development of 50 single family homes, followed by development of 36 single family homes.  (*Id.* ¶ B.i.)  The Township adopted Schreiter's recommendation, based on a special study he performed in 2003, to service Blue Ridge West Estates in part via the North Branch Interceptor, and in part by the South Branch Interceptor.  (Def.'s Ex. T at 193-94 & Ex. NN ¶ B.ii; Pls.' Ex. 23 (Blue Ridge West Estates Special Study) at 25, 39.)  Since the portion of the Blue Ridge West Estates development serviced by South Branch Interceptor was subject to the moratorium, the property would be connected to public sewer via an interceptor that would discharge the sewage in the Mill Creek Interceptor via Blue Church Road South; this did not require the construction of a pumping station such as the one McGrath sought, and used different sewer lines.  (Defs.' Ex. NN ¶ B.ii; Pls.' Resp. Ex. 23 at 25, 39.)  Furthermore, Schreiter's special study for Blue Ridge West Estates did not indicate any capacity issues.[9]  (Pls.' Resp. Ex. 23.)

_____

[9] Plaintiffs also allege that "at the very time the [Board] was denying the Developer's LVS Plan, Schreiter was reconfirming an agreement between [the Township] and Stabler Land Company for the construction and cost sharing of a pump station similar to that proposed by

Plaintiffs have not successfully illustrated that these parcels were similarly situated to LVGC's property.  Neither the Blue Ridge West Estates development nor the Curly Horse development sought to employ a connection to public sewer by means of a pump around. Furthermore, the Curly Horse development was serviced by a different interceptor, and was not subject to the moratorium, while only 36 units of the Blue Ridge West Estates development relied on the plagued South Branch Interceptor.  Most importantly, neither of these developments sought to use the sewers in Gun Club Road, nor does the record indicate that the Township's sewer system lacked capacity to service those developments, as was the case with LVS.  Accordingly, since Plaintiffs have failed to make out the first prong of the equal protection inquiry, their equal protection claims are subject to summary judgment.  *See Clark*, 514 F.3d at 113-115 (dismissing equal protection claims where the plaintiffs failed to plead facts establishing that other properties were similarly situated to their property).

## C.   This Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims

A district court has the discretion over whether to extend supplemental jurisdiction to state law claims when no federal claims remain in the case. 28 U.S.C. § 1367(c)(3) (2008) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."); *see also Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 433 (3d Cir. 1997) (the decision to decline supplemental jurisdiction over a plaintiff's remaining state law claims "is committed to the sound discretion of the district court").

------

McGrath." (Pls.' Resp. at 42.)  However, it is not clear from Schreiter's testimony, on which Plaintiffs exclusively rely, where this other property is located or that the other pump around is in fact similar to the one at issue here. (Defs.' Mot. Ex. U at 335-39.)  Accordingly, this one throw away statement cannot overcome summary judgment.

Since summary judgment has been granted on all of Plaintiffs' federal claims, this Court declines to exercise supplemental jurisdiction over the remaining state law claims. Accordingly, Plaintiffs' state law claims are dismissed without prejudice, to be re-filed in state court if Plaintiffs so choose.

## IV.    CONCLUSION

"[E]very appeal by a disappointed developer from an adverse ruling by a local . . . planning board necessarily involves some claim that the board exceeded, abused or 'distorted' its legal authority in some manner, often for some allegedly perverse (from the developer's point of view) reason. It is not enough simply to give these state law claims constitutional labels such as 'due process' or 'equal protection' in order to raise a substantial federal question under section 1983." *Creative Environments v. Estabrook*, 680 F.2d 822, 833 (1982); *see also Eichenlaub*, 385 F.3d at 286. As discussed above, Plaintiffs claims are nothing more than a local land use dispute recast as constitutional violations. Accordingly, Defendants' motions are granted as to Plaintiffs' federal claims.[10] An appropriate Order follows.

---

[10] Defendant White separately argues that he should be dismissed because he is only sued in his official capacity, which is merely another means of suing the Township, and joins in the other Defendants' substantive arguments for summary judgment. Since Plaintiffs have not established a violation of their constitutional rights, summary judgment is appropriate as to all Defendants. Thus, this Court need not separately address the arguments made by Defendant White.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LOCUST VALLEY ENTERPRISES,      :
LLC,                                 :      **CIVIL ACTION**
        **Plaintiff,**        :
                                        :
     **v.**                                   :
                                        :
UPPER SAUCON TOWNSHIP, et al.,    :      **No. 07-3059**
        **Defendants.**      :
_____ :
                                          :
LOCUST VALLEY GOLF CLUB,       :      **CIVIL ACTION**
INC., et al.,                         :
        **Plaintiffs,**       :
                                        :
     **v.**                                   :
                                        :
UPPER SAUCON TOWNSHIP, et al.,    :      **No. 07-4305**
        **Defendants.**      :

<u>**ORDER**</u>

     **AND NOW**, this **11th** day of **July, 2008**, upon consideration of the Defendants' motions

for summary judgment, Plaintiff's response thereto, and for the foregoing reasons, it is hereby

**ORDERED** that:

     1.      Defendant Supervisor James White's Motion for Summary Judgment (Docket 07-

           3059, Document No. 57; Docket 07-4305, Document No. 39) is **GRANTED** as to

           Plaintiffs' federal claims (Counts One and Two in both cases).

     2.      Defendants Upper Saucon Township, Upper Saucon Township Board of

           Supervisors, Miro Gutzmirtl, Joseph Horvath, Steven Wagner and Thomas Beil's

           Motion for Summary Judgment (Docket 07-3059, Document No. 58; Docket 07-

           4305, Document No. 41) is **GRANTED** as to Plaintiffs' federal claims (Counts

           One and Two in both cases).

3.      All of Plaintiffs' state law claims (Counts Three and Four in both cases) are

        **DISMISSED without prejudice**.

4.      The Clerk of Court is directed to close this case.

                                        **BY THE COURT:**

                                        _____
                                        **Berle M. Schiller, J.**